## JOHN W. YOCUM v. CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY.[1]

July 7, 1933.

No. 29,380.

[1]Reported in 249 N. W. 672.

*Tautges, Eichelzer & Tautges, B. W. Wilder,* and *F. M. Miner,* for appellant.

*O'Brien, Horn & Stringer,* for respondent.

*HILTON, Justice.*

Action to recover damages for personal injuries sustained in a railway accident. Plaintiff had a verdict for a very substantial amount. The trial court set it aside and ordered judgment in favor of defendant. From the judgment entered pursuant to that order this appeal is taken.

Plaintiff was 50 years of age and had been in the employ of defendant 18½ years, during the last 15 years of which he was signal gang foreman. The complaint declared under the federal employers liability act and was based upon the negligence of defendant. The answer denied such negligence, alleged assumption of risk of plaintiff and his contributory negligence, and also set up as a bar a release given by plaintiff to defendant in consideration of payment to him of $1,230. The release recited that such payment was in full settlement of all claims on account of said injuries, known and unknown,

and released and discharged defendant from all liability therefor. The reply interposed three grounds for avoiding the release and alleged: (a) Fraudulent misrepresentation as to the character, nature, and effect of the document which defendant induced plaintiff to execute; (b) that if plaintiff knew this document to be a release he was induced to execute the same by reason of the fraudulent misrepresentations of defendant as to the character, nature, and extent of his injuries; (c) that if there was no fraud the release was executed under a mutual mistake of the parties as to the character, nature, and extent of plaintiff's injuries and that he was suffering from unknown injuries not taken into consideration in the settlement.

It will not be necessary to recite the circumstances under which plaintiff was injured nor the claimed defenses other than the one predicated upon the admittedly signed release. There is no question but that the release, if not avoided, absolved defendant from any further liability. The burden was upon plaintiff to produce evidence sufficient to avoid it.

The accident occurred on September 20, 1929; the release was signed by plaintiff on February 27, 1930. Beginning March 1, 1930, plaintiff resumed his labors and worked eight hours every day except Sundays and holidays, except about two weeks in August, until December 16, 1930. In each of the months of January and February, 1931, he worked 12 days. He performed no services in March, but worked all of April except Sundays and two other days. In May he worked but three days. He testified, however, that part of the time he was not feeling well. It does not appear that he ever made any attempt to collect further compensation until the bringing of this action, June 16, 1931. The trial commenced December 10, 1931.

Plaintiff's contentions here are, in effect, the same as those contained in his reply. The court withdrew the issue of mutual mistake.

■ On the question of mutual mistake the evidence shows that plaintiff's major injury was that to his chest. He went first to his

own doctor, who after examining him referred him to defendant's doctor. The latter examined him on several occasions, took X-rays of his chest, and then advised him that the only injuries due to the accident were "abrasions and contusions over the ninth and tenth ribs, at the nipple line, and over the third and fourth lumbar spine." Plaintiff's own doctor examined the X-rays taken by the company's doctor and also examined plaintiff's chest with a fluoroscope. From those examinations he reached the conclusion that a hemorrhage had occurred in the heart cavity which had formed a blood clot, and that this blood clot had pressed the heart and lungs somewhat out of place. In the latter part of January, 1930, defendant's doctor recommended that plaintiff could go back to work. Plaintiff, however, felt that he was not able to do so. He consulted his own doctor, who gave him a letter directed to defendant, dated February 22, 1930 (just five days before the execution of the release) reading as follows:

"Mr. J. W. Yocum received traumatic injury to the chest, when a car in which he was working was struck by another RR. Co. The heart out line was moved medially—evidently due to a hemorrhage inside the pericardial sac—at the same time there was evidently a hemorrhage into the mediastinum which has not cleared up.

"Mr. Yocum was given a clean bill of health shortly before this time by your examining physician and I can see no reason for his present condition, except this trauma of the accident—He is not in condition to do hard work—and his complete recovery is problematic."

Plaintiff testified that he read the letter, that he understood something was wrong with his heart, that it was out of place, but that he thought he would eventually recover. He also testified that defendant's chief physician told him of the presence of the blood clot but that it would absorb and he would completely recover. At the time of the trial plaintiff's heart was still out of line, and he testified that he was suffering from nervousness and shortness of breath and could no longer perform his usual work. The medical testimony as to what caused the heart to be out of place was in

conflict. Such testimony on plaintiff's behalf, which we must adopt, was that the blood clot, instead of absorbing, had become solid.

The above recited evidence shows plainly that the extent of plaintiff's injury was known to himself, his own physician, and at least to one of defendant's physicians. The physical facts were not materially in dispute. That such known injury resulted in consequences not expected at the time of the signing of the release would not be ground for the avoidance of the release.

"To justify rescinding a contract or release on the ground of mutual mistake, the mistake must be as to a 'past or present fact material to the contract.' That the injuries for which settlement was made resulted in disabilities and ailments which were not anticipated at the time it was made is not such a mistake." Richardson v. C. M. & St. P. Ry. Co. 157 Minn. 474, 476, 196 N. W. 643. See Fornaro v. Minneapolis St. Ry. Co. 182 Minn. 262, 234 N. W. 300; Dolgner v. Dayton Co. 182 Minn. 588, 235 N. W. 275; West v. Kidd, 184 Minn. 494, 239 N. W. 157.

The withdrawal of the issue of mutual mistake was proper.

■ The claim of fraud as to the character, nature, and extent of plaintiff's injuries is based largely upon the statements made to him by defendant's first examining physician, which were that the injuries were minor ones and that he would recover in a short time. The evidence recited in our discussion of mutual mistake convinces us that there was no reliance by plaintiff on those statements.

■ The release was on a customary printed form, with certain blanks filled in by a typewriter. The words "GENERAL RELEASE" in large capital letters appeared at the top. In the second paragraph of the release (practically all in bold-faced type) appears this language:

"* * * I do hereby compromise said claim and do release and forever discharge said railway company * * * from any and all liability for all claims for all injuries, including those that may hereafter develop, as well as those now apparent and also do release and discharge them of all suits, actions, causes of action and claims * * *."

Beneath the language of the release were the words: "READ THIS RELEASE," in small capital letters. Just before these words the following appeared, in bold-faced type:

"* * * and I fully understand that I can make no further claim against the railway company, even though my injuries are more serious than, or different from, those I now know about or what I understand them to be."

Beneath the words "READ THIS RELEASE" were four, not heavy, dotted lines, on two of which plaintiff wrote with his own fountain pen the words: "I have read & understand this release." This writing exactly followed the lines. Below, on another such line, he in a like manner signed his name. Plaintiff testified that he never was in the habit of signing documents without reading them except routine matters of the company's business; that he never asked that documents be read to him nor indicated that he could not read them himself. He asked no one to read the document to him. His claim is that he did not read the release because he did not have his glasses and that he could not see to read it without them. However, he testified that his eyes were poorer at the time of the trial than they were on February 27, 1930, when he signed the release; yet at the trial, without his glasses, he was able to see the dotted lines below the release proper and upon which he had written: "I have read & understand this release," and also the dotted line where he signed his name. He also testified that he did not read the draft when he cashed it at the bank and saw only the figures $1,230, which were larger than the printed and typewritten part of the draft, but were in fact less in size and prominence than were the words "GENERAL RELEASE" on the release and settlement.

Although contradicted by Coffman (the claim agent of the defendant), plaintiff testified that before he signed the release he told him that he would not sign any papers to release the company for the injuries; that Coffman told him that the amount received was in payment of his wages for the preceding five months and for one month in addition; that the release was just a receipt and would

represent only the money paid to him at that time, and would not be considered as release or discharge from liability; that Coffman told him that if he would go back to work they (the company) would keep him employed at his standard foreman's wages, and that in case he could not work after he went back it would pay him compensation; and that Coffman, before leaving the room, told him what to write and to sign it. It is upon these claimed statements of Coffman that plaintiff predicates his claim of fraud that induced him to sign the release.

Plaintiff was born in America of American parentage. His early schooling was somewhat limited. For many years in his position as signal gang foreman his work was of a more or less technical nature and included the paper work of his crew, following and preparing blue print plans and specifications. His testimony shows that he was keen, alert, and well understood the English language. There was no solicitation for or an attempt to make a settlement by the defendant's claim agent prior to the time the release was signed. The release was not concealed from him. Plaintiff, while alone in the room while Coffman was in another office securing a person to act as a witness, had it in his possession with every opportunity to read it, and while so alone wrote that he had read it. After plaintiff had signed the release Coffman returned to the room with a stenographer and both of them signed it as witnesses. The draft for $1,230 which plaintiff received was in the usual form and when delivered to him had typed thereon:

"For full settlement for any. and all claims and personal injuries received at or near Victor, Iowa, on or about September 20, 1929, while a Signal Foreman."

After plaintiff had signed the release and received the draft, Coffman gave him a letter reading:

"In the settlement made this date for personal injuries received at or near Victor, Iowa, on September 20th, 1929, it is agreed that any treatment for or arising from this injury is to be given free to you by our company doctors. This to apply as treatment for anything pertaining to this injury."

404

This letter was retained by plaintiff. After resuming work, on several occasions he went to defendant's doctor and received attention.

Plaintiff's own testimony above recited and the exhibits established that he must have known that the instrument he was executing was a release. It was headed, in large letters, "GENERAL RELEASE." He himself wrote: "I have read & understand this release." An instrument of the plain significance of this one cannot be set aside and avoided upon testimony of such an improbable and incredible nature as that he could not read without his glasses or that he was told that the instrument was merely a receipt. It is inconceivable that a man of plaintiff's intelligence and experience would have signed what he must have known was an absolute release and discharge of all liability on the bare statement of defendant's agent that it was not a release, but simply a receipt for an advancement made. It was plaintiff's duty to ascertain what the provisions of the instrument he was about to sign were. His admitted failure so to do was inexcusable negligence. He cannot, simply by saying he did not read it, escape its force and binding effect. A written contract is the highest evidence of the terms of an agreement between the parties to it. It cannot be avoided for fraud or mistake unless the evidence of fraud or mistake is clear and convincing. Measured by this recognized standard, the evidence did not entitle plaintiff to a verdict. Fornaro v. Minneapolis St. Ry. Co. 182 Minn. 262, 234 N. W. 300; Dolgner v. Dayton Co. 182 Minn. 588, 235 N. W. 275; Richardson v. C. M. & St. P. Ry. Co. 157 Minn. 474, 196 N. W. 643; Nygard v. Minneapolis St. Ry. Co. 147 Minn. 109, 179 N. W. 642; Wall v. Meilke, 89 Minn. 232, 94 N. W. 688; Hanley v. Hines, 176 Wis. 252, 186 N. W. 602; Crum v. McCollum, 211 Iowa, 319, 233 N. W. 678; C. St. P. M. & O. Ry. Co. v. Belliwith (C. C. A.) 83 F. 437; C. & N. W. Ry. Co. v. Wilcox (C. C. A.) 116 F. 913; Rader v. Lehigh Valley R. Co. (C. C. A.) 26 F. (2d) 73; Merwin v. N. Y. N. H. & H. R. Co. (C. C. A.) 62 F. (2d) 803; McKenney v. Boston E. Ry. Co. 259 Mass. 28, 155 N. E. 788; 13 C. J. p. 370, § 249.

We have considered all of the assignments of error and find no ground therein for reversal.

Affirmed.