CHARLES LA ROSA, APPELLEE, v. UNION PACIFIC RAILROAD COMPANY ET AL., APPELLANTS.

5 N. W. (2d) 891

FILED OCTOBER 16, 1942.   No. 31373.

*T. F. Hamer, G. C. Holdrege* and *W. J. Schall,* for appellants.

*Carnazzo & Kazlowsky* and *Grenville P. North, contra.*

Heard before SIMMONS, C. J., EBERLY, CARTER, MESSMORE and YEAGER, JJ.

MESSMORE, J.

This is a damage action, based on alleged negligence of the defendants, resulting in personal injuries to the plaintiff. The cause was submitted to a jury, and a verdict returned in favor of the plaintiff in the sum of $7,800. From the judgment thereon, defendants appeal.

The petition presents a factual statement sufficient in form to state a cause of action, in that the plaintiff, a mill worker, employed in defendant company's shops, was engaged in the operation of a crosscut saw; that the saw did suddenly and without warning swing forward toward and against the plaintiff, cutting his arm, while he was in the exercise of reasonable care in its operation; that he had never been warned by the defendants of the unsafe, insecure and dangerous condition of the saw, or that the same was liable to swing forward and against him; that the defendants knew, or should have known, of the dangerous condition of the device, and negligently allowed the same to become out of repair and dangerous and to continue in a dan-

gerous condition, and failed to maintain the crosscut saw in a safe condition for the use by plaintiff and others. Plaintiff alleged that defendant Nickels was employed by the defendant railroad, in charge of maintenance, inspection and repair of the saw and other devices, and knew, or should have known, its condition; that such negligence caused the plaintiff's injuries, which were described, and prayed for damages.

Defendants answered, admitting the employment of plaintiff and that defendant railroad maintained a crosscut saw described in plaintiff's petition, and admitted that he was injured, denying any negligence on their part causing said injuries. As a defense, defendants alleged that following the injury plaintiff made claim against the Union Pacific Railroad Company to perfect a settlement; that the claim, by agreement, was settled for the amount of $4,000, the plaintiff signing a release in full satisfaction, and dismissal of the plaintiff's petition was prayed. For reply, plaintiff admitted the execution of the release and receipt of $4,000 as consideration therefor, but alleged that at the time of signing the same he did not know the real nature and extent of his injuries; that the release was obtained through false and fraudulent statements and representations made by claim agents and doctors of the defendant railroad company prior to the signing of the release, and were with reference to the then physical condition of the plaintiff, setting forth a factual situation in explanation, which will be covered as far as material in a review of the evidence; secondly, that the release was signed under a mutual mistake of fact, had by each of the parties as to the injuries unknown, and also as to the severity of the injuries, in that plaintiff's injury was not slight and temporary, but serious and permanent; that it was not true that the muscles, cords, nerves and blood vessels of his arm were not injured, because, in fact, they were injured; that it was not true that his ability to work would be as good as ever and no disability would result, because plaintiff. since said accident, has been unable to do or perform any work whatsoever, suffered permanent

disability, and will be unable to do his customary work and labor for the rest of his life.

The court submitted the case to the jury on the question of negligence, if any, of the defendants, and denied the submission of fraud, but submitted the question of mutual mistake, as pleaded in plaintiff's reply.

The plaintiff, 34 years of age at the time of the accident, before his employment with the defendant railroad was a machinist and experienced in running saws of different kinds used in the cutting of wood. He went to work for the defendant railroad January 15, 1936, at $130 a month and worked until the 27th day of April, 1936, on which latter date the accident happened at 1:20 p. m. while he was operating a crosscut (circular) saw, cutting decking for box cars. The saw was powered by an 8-horse power electric engine; the motor and saw were together and hung from a platform which extended four or five feet from the west wall of the building, located like the pendulum of a clock. When it was not necessary to operate the saw, a counterweight automatically pulled it back to the west wall. The counterweight was held in place by a bolt which forced it or brought the weight of the counterweight into operation, so as to pull the saw back as soon as the operator was through with it. There was an arm where the weight was located that threw it out on a bar, which would clear the bench of this circular saw, and did so when the bolt was normal. At the time of the accident this bolt snapped, releasing the weight or counterbalance, permitting it to spring toward the plaintiff, who had just cut one end of a board.

The plaintiff testified that neither his foreman nor any other person had ever instructed him that there was anything dangerous about the machine, or that this pin, or bolt, was liable to break; that an employee, William Nickels, was in charge of the machine, to inspect it; that when the accident happened the plaintiff grabbed a handkerchief, saw blood coming from the wound, and put it on the wound; "Nickels put a piece of twine over my elbow and tightened it up with a sliver." Subsequently, plaintiff appeared at

the office of Dr. Otis Martin, who poured some medicine on the wound, and put on a tourniquet and bandaged the arm. Plaintiff was then taken to a hospital, where Dr. Kennedy unwrapped his arm and told him to turn his head so that he would not become sick from watching the operation. A nurse and one Ray Best, also a nurse, were present. Plaintiff stated he did not know what Dr. Kennedy did. His arm was bandaged and a cast applied, which covered his arm to his fingers, so that he could not move it, and it rested in a "trailer support." Dr. Kennedy performed the first operation on the plaintiff's arm, following which he dictated the details of the operation to a nurse, who incorporated the same in the hospital records, and which is in evidence. The operative record reads: "Lacerated wound about 3″ long extending across the anterior aspecte of the left forearm going down almost to the bones; severing body and tendons of the flexor muscles, both deep and superficial, palmaris longus, pronator radii teres; severed both radial and ulnar nerves and the ulnar artery." Under "What Was Done," Dr. Kennedy's report reads: "Incision enlarged. Ligated the artery, sutured tendons and nerves with #00 chromic catgut and skin with dermal and arm dressed on a molded posterior plaster of Paris splint in extreme flexion." The cast was removed nine weeks after it had been applied, following which plaintiff went to Dr. Kennedy's office for bandaging from April until July. He returned to work December 5, 1937, and worked off and on until October 31, 1939, at the same classification as car man freight, and at the same rate of pay.

Plaintiff testified to conversations had with Dr. Kennedy. As to the first he was asked: "Mr. La Rosa, I wish you would tell us now just what you said to the doctor, that is, Dr. Kennedy, and what he said to you in that first conversation you had with him, and I want you to give it just exactly, as nearly as you can give it to us, word for word." He answered: "I says, 'Doctor, how about this arm?' And he told me, he says, 'There is nothing there that is cut that won't heal up. It is just a matter of time until you get your

use in the hand,' and told me not to worry." As to the second conversation he was asked to tell what he "said to Dr. Kennedy and what he said to you. A. Well, after they had dressed this hand the nurse and Mr. Best was on the way out, and I called Dr. Kennedy back. I says, 'Doctor, can I see you a minute?' He says, 'Yes, what is it you want?' I says, 'Doctor, am I ever going to use this arm? Are you going to cut it off, or what are you going to do?'" When asked what Dr. Kennedy said to him, his answer was: "He told me, 'There is nothing cut in that arm that is going to interfere with your hand to do the work you have been doing,' and he told me not to worry about that hand."

There had been a suggestion and talk of a settlement of the plaintiff's claim, and he, having this in mind and that he might perfect a settlement with the company, had a conversation with Dr. Kennedy, in substance, as follows: "A. I asked him,—they wanted me to settle you see,—I says, 'Doc. I want to know more about this arm.' He told me, he says, 'That arm is going to be all right.' He says, 'There is nothing there that is going to hurt the use of that arm. There is no reason why you can't do your work like you did and it will be as good as the other hand.' * * * He said it was just a matter of time for the rebuilding of the muscles. He said this hand had been laid up so long. He gave me a sponge ball, and the gripper I had too. Q. And you used those, did you? A. Yes. Q. That improved your hand, did it? A. Yes, it showed some improvement. Q. That was the extent of the conversation, was it? A. That was all at that time." The court and jury did not have the benefit of Dr. Kennedy's testimony, he having died prior to the time of the trial.

There is testimony of other and further treatments and another operation that was performed on plaintiff's hand a year after the accident. One Cox, claim agent for the defendant company, through Dr. Freyman, sent the plaintiff to Miss Potts for electrical treatments for about three times a week from July, 1936, to April, 1937, and Dr. Schrock in the same office with Miss Potts examined the arm in De-

cember, 1936, and arrangements were made for the second operation. Miss Potts told the plaintiff to see Dr. Kennedy, who, in turn, arranged for the second operation. Plaintiff went to the hospital for the second time, where he was given a local anesthetic and remained conscious all the time, but did not see any part of the operation, as he was told to look to one side. His arm was bare when he went into the operating room, and was bandaged when he came out. The operation lasted about 30 minutes. He remained in the hospital for 16 days, going to see Dr. Kennedy every other day for dressings, until the first part of June, when the bandages were taken off. This terminated the services of Dr. Kennedy.

The complaint is based on the proposition that Dr. Kennedy did not inform the plaintiff that the body and tendons of the flexor muscles, palmaris longus, pronator radii teres and the radial and ulnar nerves and ulnar artery had been severed. The second operation was for the purpose of removing adhesions. Dr. Mauer, one of the defendant railroad's doctors, is alleged to have told the plaintiff that he was not to worry; that his hand would come out all right, and there was nothing cut in the arm that would destroy the use of it.

With reference to the release, which was signed November 29, 1937, the plaintiff first talked, in February, 1937, about a settlement of his case with Joe St. Lucas, a friend. St. Lucas is a foreman in the Union Pacific shops where the plaintiff's father was employed and would come over to the house and talk about the case. Plaintiff first met Mr. Cox, the Union Pacific claim agent, in September, 1936, but did not talk to him about settling the case. He saw Mr. Cox, beginning in November, 1936, but did not discuss with him a settlement on occasions when he went to report the condition of his hand. Cox first suggested settlement in February, 1937, in the presence of St. Lucas. The company offered $1,500, a year's salary, to adjudicate the claim. Plaintiff thought over this offer for some considerable time, and finally, in a conversation with Cox in September, 1937, the

latter offered to settle for $4,000. Plaintiff said he would think it over. He came back in two weeks; the $4,000 was offered; he was told he was over 21 and could do as he pleased. On November 29, 1937, he went to see Cox, and the plaintiff and one Trout had a conference with reference to a settlement; $7,000 was suggested by the plaintiff, and finally $7,800 was mentioned, but the release was consummated on the day stated in the amount of $4,000; the plaintiff saying: " 'Well, I might as well sign it.' I couldn't starve. It was nineteen months after the accident. I had to get some money some place." He testified he read the release before he signed it and received $4,000. The next day he cashed his check, asking that he be given three 1,000-dollar bills and two 500-dollar bills.

The record discloses in behalf of the defendants with reference to the conversations claimed to have been had between Dr. Kennedy and the plaintiff the following, in substance: Ray Best, chief nurse for the Union Pacific ward of the hospital for 27 years, Miss Mary Gertrude Savage, a nurse by profession, and Dr. Roy Mauer, all remembering the plaintiff as a patient of Dr. Kennedy, and being present when the alleged conversations between plaintiff and Dr. Kennedy took place, testified that they were general in character, in that the plaintiff asked the doctor how he was getting along and the length of time he would be laid up; that the doctor would tell him that he was getting along nicely and the wound was healing properly, with no infection present, and all of these witnesses stated that no such conversations as testified to by the plaintiff were had.

Of the physicians testifying for the plaintiff, Dr. W. R. Hamsa made an examination of plaintiff October 13, 1941. He found a four and a half inch scar, one-quarter inch wide, running diagonally across plaintiff's forearm, and in the middle thereof a two-inch scar, about three-quarters of an inch wide, running directly upward; the scar being partly bound down to some of the tendons that bend the fingers and over the area where two large nerves come down the forearm into the hand, and that the scar moves with the

tendons of three fingers only and not with the deep tendons passing the tips of the fingers but only those passing underneath the skin; that there are two tender areas over the big nerves, producing a tingling sensation in the hand; that there is a loss in the muscles that separate the fingers and the "small muscles that do the fine movements of the hand are knocked out to a great degree;" that there is also a definite injury to muscles used for grasping, and definite disturbance of sensation in the hand; that the condition of the hand is at a standstill, for the reason that two years have elapsed without improvement; that unless intervention is had, that is, an exploratory operation, the condition will remain. In the doctor's opinion, one-third disability occurred; there is a shrinkage in plaintiff's left hand, compared with his right, and the efficiency of his hand is impaired in the movement of lumber.

The testimony of Dr. Muehlig corroborated that of Dr. Hamsa, with a slight variation in detail, in the conclusion that, as a laborer, plaintiff suffered the loss of the use of his hand for fine movements; that he could operate a crosscut saw but with some difficulty; that he would not be as efficient, depending on his eyesight.

Plaintiff's petition was filed on April 25, 1940, two days less than four years from the date of the accident. The record discloses a controversy with reference to the plaintiff's working status, in that some employees had on various occasions been placed back at work prior to himself, who he felt were junior, while his rights were senior. We will not detail this evidence except to say that it is apparent from the scope agreement between the railroad company and car men that certain employees are entitled to return to work when relieved from other duties, in preference to retaining employees bearing plaintiff's work status. Plaintiff obtained car man freight rating, due to a shortage of car men at that time who were engaged in other elements of work. There is additional evidence as to his ability as a musician in playing a saxophone and clarinet and the effects of his injury with reference thereto, and that he earned approximately $100 a month in this profession.

We are concerned with the validity of the release, and whether or not there was a mutual mistake, as contended for by the plaintiff, and whether the release should be vacated. A discussion with reference to the negligence of the defendants, if any, is therefore not required, and an examination of the record shows conclusively that the trial court did not err in not submitting to the jury the question of fraud.

In the case of *Simpson v. Omaha & C. B. Street R. Co.*, 107 Neb. 779, 186 N. W. 1001, this court held: "To avoid a written release of damages for personal injuries on ground of mutual mistake of the parties, the mistake must relate to a present or past fact or facts that are material to the contract of settlement, and not to an opinion as to the future conditions as to results of present known facts." The true rule as laid down in the opinion is "that the mistake must relate to either a present or past fact or facts that are material to the contract of settlement, and not to an opinion as to future conditions as the result of present known facts. A mistake as to the future development of a known injury is a matter of opinion, and is not one of fact, and is not such a mistake as will avoid a release, but, where the mistake is as to the extent of the injury due to unknown conditions or relates to injuries that were wholly unknown, then the release may be avoided, unless it further appears that the parties were contracting with respect to possible unknown injuries, and the releasor intended to relinquish all claims, whether known or unknown." In this connection the release is pertinent. It reads:

"Release of All Claims

"Received of Union Pacific Railroad Company Four Thousand Dollars ($4,000).

"In consideration thereof, I hereby release Union Pacific Railroad Company * * * from all claims or causes of action that exist or may hereafter accrue, for damages for any and all personal injuries, including possible unknown injuries, and for complications arising from such injuries or treat-

ment thereof; for loss of services; for medical or other expenses; and for loss and damage to property; growing out of an accident * * * .

"The above amount is the full consideration for this settlement, and no promise or contract of future employment has been made.

"I have read the foregoing receipt and release and fully understand the same."

The foregoing statement appears also in the handwriting of the plaintiff. The release is witnessed and dated at Omaha November 29, 1937.

It is uncontradicted that following the settlement of his claim the plaintiff returned to his job as car man freight in the company's Omaha shops, same classification and at the same rate of pay, and worked therein at times for a period approximating two years. The record is barren of proof that plaintiff was unable to do the work. He knew that a circular saw, powerful enough to cut heavy lumber, suddenly swung about and cut his arm. He saw the open wound, because he saw blood coming from it. He put a handkerchief over it, and he knew the wound was serious. He saw Dr. Martin put some medicine on the cut. He knew he was so seriously injured that he was taken to a hospital; knew that his arm was operated upon and that the operation lasted about an hour. He was told to look away, because it would make him sick to see it. He knew his arm had been in a plaster cast for a period of nine weeks. He knew that he had been severely cut, because he expressed concern to Dr. Kennedy about whether it would be necessary to amputate his arm, and whether he would be crippled for life. He knew that the movement of his fingers was restricted following the removal of the cast. He must have known the extent to which he could move his fingers, and would notice improvement, if any, from time to time. He knew that a second operation was necessary because of adhesions, or, as he put it, Dr. Schrock told him there were "brakes" in his arm, impeding the movement of his hand. He knew a second operation was performed, which lasted 30 minutes,

and when a settlement was first suggested, he wanted to wait until he knew what the result of the operation would be. He had the second operation in mind and wanted it "cleared up" before he perfected a settlement. This would indicate clearly that there was no mistake of fact, so far as plaintiff was concerned, when he made the settlement. The evidence discloses that defendant company's doctors knew precisely the nature and extent of the plaintiff's injuries. There was no mistake of fact on their part. The communications were merely expressions of opinion concerning the future development of a known injury. The plaintiff, himself, knew the extent and nature of his injuries.

Reviewing the record, it is conclusive that Doctors Kennedy and Mauer knew the nature and extent of the plaintiff's injury. The record in this case justifies the conclusion that there was not a mutual mistake, as contended for by the plaintiff, and that the release is a *bona fide*, valid instrument.

The judgment of the district court is reversed, and plaintiff's petition dismissed.

REVERSED AND DISMISSED.