151 So.2d 725

CENTRAL OF GEORGIA RAILWAY COMPANY

v.

Greer L. RAMSEY.

6 Div. 751.

Supreme Court of Alabama.

Dec. 20, 1962.

Rehearing Denied April 11, 1963.

Sadler, Sadler, Sullivan & Herring, Birmingham, for appellant.

9

Rives, Peterson, Pettus & Conway, Birmingham, for appellee.

HARWOOD, Justice.

The appellee, who was the plaintiff below, was employed by the appellant, defendant below, as a trainman. For convenience the parties will hereinafter be referred to as the plaintiff and defendant, the positions they occupied below.

The plaintiff sought damages because of alleged injuries to his left ankle caused by the sudden stopping of a train on which he was a crew member.

His complaint contained two counts. Count number 1 alleged a violation by the defendant of Title 45, Section 2 of U.S.C.A., commonly known as "the Automatic Coupler Act," and Count number 2 alleged a violation of Title 45, Section 1, U.S.C.A., commonly known as the "Federal Safety Appliance Act."

The jury returned a general verdict in favor of the plaintiff and assessed his damages at $20,000.00. The court entered a judgment pursuant to the verdict.

No motion for a new trial was filed in the court below.

In briefs counsel for the appellant-defendant have argued two assignments of error, Nos. 14 and 15, which assignments relate to the refusal of affirmative charges with hypothesis going respectively to Count 1 and Count 2 of the complaint.

The evidence presented by the plaintiff in the trial below tends to show that on 1 October 1953, the plaintiff was riding as a crew member in the caboose of defendant's train when the same came to a sudden stop at a point in Alabama. The plaintiff was thrown about by the stop, and his right ankle was painful. However, he left the caboose and walked along the train several cars and found that the cars had become uncoupled. The air hose which controls the brakes had become disconnected. The plaintiff reconnected the air hose and the train continued its run.

Upon arrival at Columbus, Georgia, the plaintiff consulted the defendant's doctor, Dr. Sykes, who, after taking x-rays, informed the plaintiff that he had a sprained ankle and would be all right in a few days. On 12 October 1953, the plaintiff was paid $69.00 by the defendant, and signed a release.

The plaintiff was unable to return to work because of the condition of his ankle and on 20 October 1953, he was admitted to the hospital operated by the defendant in Savannah, Georgia.

After x-ray examination he was informed by Dr. C. F. Holton, chief surgeon in defendant's hospital, that his ankle was fractured. He was assigned to Dr. Edwards, an orthopedic specialist, who placed a cast on defendant's left leg.

On 28 October 1953, the plaintiff left the hospital and returned to his home to convalesce.

While at the hospital the plaintiff told the Assistant General Manager of the defendant's hospital that he had signed a release based on information that he had a sprain, and since his injury had turned out to be a fracture, he felt something further should be done for him.

The plaintiff was again in defendant's hospital from 4 December 1953 to 10 December 1953, and again on 5 January 1954, when the cast was removed from his leg.

At this time Dr. Holton issued a certificate discharging the plaintiff from further treatment, and stated he would be ready for full duty on 12 January 1954.

On 15 January 1954, the plaintiff made one passenger run, and upon his return found his ankle badly swollen. He thereupon took a two weeks' vacation.

On 30 January 1954, the plaintiff's ankle gave way as he was walking in his kitchen, he fell, and a bone in his right ankle was broken. He went to Drs. Flinchum and Houghston in Columbus, Georgia, private practitioners, and a plaster cast was put on his right ankle.

The plaintiff testified that on 8 February 1954, he was called by Mr. Stewart, a claim agent for defendant, and was told that authority had been given to pay the plaintiff from the date of the last settlement to 8 February 1954, and that he, Stewart, had talked to Dr. Holton who had stated that plaintiff had "been turned loose for full duty to go back to work, and that I was going to be all right." Plaintiff told Mr. Stewart he would sign the release but if he had more trouble he would come back. The plaintiff thereupon executed a release for $1217.00, and also signed a separate paper referred to as a certificate to accompany employee release, which paper recited that the money paid in settlement was to factors other than loss of time.

The plaintiff was again in defendant's hospital from 5 May 1954 to 12 June 1954, during which time Dr. Brown of the hospital staff operated on plaintiff's ankle, wiring parts of the bone together.

On 16 August 1954, the plaintiff was again admitted to the hospital, and on 23 August 1954, Dr. Brown again operated on the ankle and removed a piece of bone. During this stay in the hospital plaintiff was paid another benefit check. A cast put on the ankle was removed on 8 October 1954.

On 27 October 1954, Dr. Holton again discharged the plaintiff telling him he was

going to be all right and ready for full duty on 1 November 1954.

The plaintiff thereafter did light work, but said his ankle was painful, and had a check-up on 2 December 1954.

On 3 December 1954, the plaintiff consulted Dr. Flinchum, and this doctor testified that at this time a minimal degree traumatic arthritis was present in the ankle, and Dr. Flinchum wrote Dr. Holton a letter in which he stated: "As for disability in this ankle (left ankle) I would be hesitant to estimate, but around 5 to 10 percent might be considered if that agrees with Dr. Brown's opinion."

The plaintiff continued work but claimed he had pain. On 15 April 1955, Dr. Flinchum gave him an injection and on 21 April 1955, he returned to the hospital at which time a wedge was put in his shoe. On 19 October 1955, Drs. Holton and Brown fitted him with a brace for his left leg, and he was again "turned loose for full duty."

On 17 January 1956, Dr. Sharpley of the defendant's hospital performed an operation on plaintiff's left ankle. He was again in the hospital from 14 October 1956 to 16 October 1956, and from 13 March 1957 to 27 March 1957, and had another operation then, performed by Dr. Brown.

The plaintiff was again in the hospital from November 7, 1957 to December 20, 1957; from July 21, 1958 to August 2, 1958.

In November 1958, a private practitioner, Dr. Elkins, saw him. This doctor testified that plaintiff's pain was justified and advised him to have certain fragments in his ankle removed. Plaintiff was again in the hospital from 19 January 1959 to 27 January 1959, and on 10 June 1959, his left ankle was operated on again. Certain tissue, bone, and cartilage was removed.

Dr. Holton told plaintiff after each of his operations that he could return to full duty, and so reported to the defendant.

The plaintiff testified that while he was in the hospital on 9 October 1954, he was visited by Mr. Sease, defendant's Assistant General Manager, and Mr. Ozburn, Assistant Chief Claim Agent for the defendant. They told him that the defendant company would pay him every dime they owed him, and Dr. Holton had informed them both that the plaintiff was going to be all right to go back to full duty.

Again, on 8 February 1955, according to plaintiff's testimony, Mr. Stewart, defendant's claim agent called the plaintiff and told him to bring his wife to the Claim Office at Columbus, Georgia, as Mr. Ozburn had authorized a payment to plaintiff from the second settlement up to the time of Stewart's call; that Mr. Stewart told him he had talked to Dr. Dukes, Mr. Ozburn, and Dr. Holton, and Dr. Holton had said that the plaintiff had been turned loose for full duty and would be all right. The plaintiff replied he had not been working much but that Dr. Holton had told him his foot was going to be all right, and "okeh" to turn loose for full duty," but if it wasn't he would come back to Stewart. On his visit to the Claims Office, the plaintiff was paid $3260.00, less $1170.00 refunded to the Railroad Retirement Board. The plaintiff again signed a release, and a "Certificate to Accompany Employee's Release," but testified that Dr. Holton's assurances to him were the reasons he signed the release.

In this connection the plaintiff testified that on each occasion that he signed releases he was informed that the defendant was simply paying him for lost time.

The plaintiff further testified that while he was in the hospital in March 1957, Mr. Ozburn came to his room and plaintiff asked him about helping him out, stating that Mr. Sease and Mr. Ozburn had promised to do so. The plaintiff further stated to Mr. Ozburn that since the settlement in 1955, he had had two operations, and wore a steel brace, but was yet unable to work. Then according to plaintiff:

"A Mr. Ozburn told me, says, Ramsey, we made three settlements with

you, you signed three releases, and I am not going to give you any more money. Your three years, the statute of limitations—I didn't know there was a statute of limitations, I didn't know nothing about that. He said your statute of limitations has run out, and we are going to stand on the settlements, the three settlements that we had, that we gave you.

"I said, what am I going to do, what can I do? And he said you can't do nothing.

"Q Did he tell you you could not do anything?

"A He said that I had had three settlements, and they had paid me three times, and my statute of limitations was the three years, and that I had settled, and that was all."

Following this conversation the plaintiff did nothing until 1 May 1957, when he discussed his situation with the General Chairman of his Railroad Brotherhood. This official stated he did not know what to tell the plaintiff, but suggested he consult a lawyer. Thereafter on 3 May 1958, the plaintiff came to Birmingham and consulted an attorney, and was given advice. This suit was brought on 20 April 1959.

By argument in support of appellant's assignment of errors, each of which as before stated are directed to the court's refusal to give appellant's written hypothesized affirmative charges to each count of the complaint respectively counsel for appellant have urged three points as constituting error in the refusal of said charge.

1. The appellee could not avoid the releases given appellant, and was bound by them since the existence and extent of his injuries were known to appellee at the time he gave the releases, and the burden was upon the appellee to prove that the releases were obtained by fraud practiced upon him or by a mutual mistake of fact under which both parties acted.

2. That the action was barred by the statute of limitations, and

3. That the appellee did not restore the consideration paid for the releases prior to his attempted recission of the releases.

We will discuss the above points in the order in which they are listed.

1. *Avoidance of the releases.*

■ It is the contention of the appellant that no mistake permeates the releases signed by the appellee in that the appellee was fully cognizant of his physical condition at the time he signed the releases, and any representation by defendant's doctors and agents was as to the prognosis, or future developments in appellee's physical condition, and not as to diagnosis, or appellee's present condition.

In this connection appellant cites Yocum v. Chicago, R. I. & P. R. Co., 189 Minn. 397, 249 N.W. 672; La Rosa v. Union Pacific R. Co., 142 Neb. 290, 5 N.W.2d 891; Chicago & N. W. R. Co. v. Wilcox, 116 F. 913 (CCA8); Chicago & N. W. R. Co. v. Curl, 8 Cir., 178 F.2d 497.

In the Wilcox case, supra, the plaintiff had suffered a broken hip in a fall caused by a sudden stopping of defendant's train. She had been a trained nurse and had worked for the doctor who was her physician, and also physician for the defendant railroad. She testified that she signed a release for her claim against the defendant on the basis of the doctor's statement that she would be well in a year. Her injury proved to be permanent.

The doctor testified he had told the plaintiff that her injury was serious and the better plan would be to wait until the extent of her injuries were known before making a settlement.

The majority opinion stated that the acts and testimony of the doctor "impress one with his candor, faithfulness, and truth," and that the plaintiff had not established her charge of mistake by clear,

convincing, and unequivocal testimony essential to sustain a suit for the recission of a written agreement of compromise.

The majority opinion further stated that conceding the doctor had told the plaintiff she would be well in a year, she was fully informed as to her condition, and any mistake in the opinion of the doctor was as to a future event, and were not matters of fact but speculation as to future event.

It is to be noted that Thayer, J., concurred in the above opinion only to the extent that the plaintiff's evidence that she was unduly influenced by the doctor in signing the release was too uncertain and conflicting to warrant a court setting aside the release, but stated further that if the plaintiff was deceived by the doctor's advice as to her condition then "the company should be held accountable for his wrongful conduct, and the release which was executed in reliance upon his advice, if it was so executed, should be vacated."

It should be remembered that in the present case, there being no motion for a new trial, we are not concerned with the weight of plaintiff's evidence to sustain his allegation that the releases were signed through mutual mistake, but only if a scintilla of evidence tends to show such mistake.

In Yocum v. Chicago, R. I. & P. R. Co., 189 Minn. 397, 249 N.W. 672, the plaintiff had been informed by his own physician prior to signing the release that his full recovery from his injury, of which the plaintiff had full knowledge, was problematical. These facts are so different from those in the present case as to make the conclusions in the Yokum case inapplicable.

In La Rosa v. Union Pacific R. Co., 142 Neb. 290, 5 N.W.2d 891, the Nebraska court expressly found that the plaintiff knew the nature and extent of his injuries at the time he signed the release.

In Chicago & N. W. R. Co. v. Curl, 178 F.2d 497 (CAA8 1950), cited by appellant, we find the following statement:

"* * * It was only necessary that he produce evidence which, read in the light most favorable to him, supported a finding of the jury that at the time of the release appellee was suffering from a substantial and severe injury from which, at best, recovery was doubtful, and that the release was given in the mistaken belief on the part of appellee and appellant, honestly but erroneously held, that appellee's injury was not permanent nor serious, but on the other hand of a minor character from which his complete and early recovery was certain."

On the other hand, many respectable authorities have held that assurances given a party that he will soon be all right are more than a mere expression or conjecture as to the future course of the party's injuries.

In Scheer v. Rockne Motors Corporation, 68 F.2d 942 (CCA2 1934) the court stated:

"There is indeed no absolute line to be drawn between mistakes as to future, and as to present facts. To tell a layman who has been injured that he will be about again in a short time is to do more than prophesy about his recovery. No doubt it is a forecast, but it is ordinarily more than a forecast; it is an assurance as to his present condition, and is so understood."

And if the patient acts upon such assurances, if they are believed by the patient, and by the physician, the case is one of mutual mistake. If the statement is not believed by the physician, it is a case of fraud, and in either case the injured party is entitled to rescind the release. See Graham v. Atchison, T. & S. F. R. Co., 176 F.2d 819 (CCA9 1949).

In accord with the above doctrines are Atchison, T. & S. F. R. Co. v. Peterson, 34 Ariz. 292, 271 P. 406; Matthews v. Atchison, T. & S. F. R. Co., 54 Cal.App.2d 549, 129 P.2d 435; Ciletti v. Union Pac. R. Co., 196 F.2d 50 (CAA2 1952). In Fort Worth & R. G. R. Co. v. Pickens (Tex.Civ.App.),

153 S.W.2d 252 (reversed on other grounds in 139 Tex. 181, 162 S.W.2d 691), it was held that a physician's statement to the plaintiff that he would be all right and able to work in two or three weeks, and should accept defendant's offer of settlement, and the execution of certificate discharging plaintiff as being well and able to resume work, was sufficient to at least raise a jury question as to the validity of a release signed by the plaintiff.

In the present case the trial court in its instructions clearly and amply covered the question of any misrepresentation and its effect upon the validity of the releases, if the plaintiff bona fide relied upon such representations. The jury found this issue adverse to the defendant. We find no basis for disturbing the judgment in this aspect

## 2. Statute of Limitations.

Despite some expressions of dissatisfaction with the results reached by a rigid application of the rule, it has generally been held that where a statute creates a new cause of action, and provides that such causes of action must be brought within the time specified in the statute, the time limitation was considered as a part of the newly created right, and could not be tolled or suspended for any reason not expressly excepted in the statute. See 15 A.L.R.2d pp. 501 through 527.

■ We are here concerned with a federal statute. Decisions of appellate federal courts, construing federal statutes, in the absence of a contrary holding by the Supreme Court of the United States, are binding on us. Dickey v. West Boylston Mfg. Co., 251 Ala. 19, 36 So.2d 106. And of course we are controlled by decisions of the United States Supreme Court in respect to its interpretation of federal statutes. Atlantic Coast Line Ry. Co. v. Mangum, 250 Ala. 431, 34 So.2d 848.

■ The more recent federal appellate court decisions are to the effect that legal fraud can toll the time in which suit must be brought under the F.E.L.A.

In Scarborough v. Atlantic Coast Line Ry. Co., 4 Cir., 178 F.2d 253, 15 A.L.R.2d 491, the plaintiff, an infant had sustained his injuries on 24 September 1944. Suit was filed on 17 March 1949. The complaint alleged that the plaintiff had been assured by the defendant's claim agent that he had a reasonable length of time after reaching 21 years of age in which to bring suit. The district court dismissed the cause of action on the theory that limitation on time in which to bring suit was of a substantive type and conduct by the defendant would not work an estoppel and toll the time limitation in which suit would have to be brought. In reversing the judgment of the district court, the Fourth Circuit Court of Appeals, through Dobie, J., wrote:

"The decisions in the Osbourne and Frabutt cases, supra, show clearly that there is a chink in the supposedly impregnable armor of the substantive time limitation of the Act. If, as those cases decided, there is one exception (war), surely the infinite variety of human experience will disclose others. Those cases demonstrate that a claim under the Act is not a legal child born with a life span of three years, whose life must then expire, absolutely, for all purposes and under all circumstances. True it is that war physically prevents access to the courts, however anxious a litigant may be to bring suit. Fraud, however, as in the instant case, may be equally as effective in preventing one from seasonably suing on his claim; and, if permitted to succeed, it affords a continuous temptation thus to defeat the primary purposes for which Congress passed the Act.

"Judge Frank in the Osbourne case and Judge Parker in the Burkhardt case, supra, have shown that the distinction between a remedial statute of limitations and a substantive statute of limitations is by no means so rock-ribbed or so hard and fast as many writers and judges would have us believe. Each type of statute, after all,

still falls into the category of a statute of limitations. And this is none the less true even though we call a remedial statute a pure statute of limitations and then designate the substantive type as a condition of the very right of recovery. There is no inherent magic in these words."

In Glus v. Brooklyn Eastern District Terminal, 359 U.S. 231, 79 S.Ct. 760, 3 L. Ed.2d 770, suit had been brought under the F.E.L.A. some seven years after the date of injury. The plaintiff had claimed that the defendant was estopped from raising the statute of limitations because it had represented to the plaintiff that he had seven years in which to sue. The defendant claimed that in F.E.L.A. cases the time limitation was an integral part of the cause of action and such cause was irretrievably lost at the end of the statutory period. The Circuit Court of Appeals for the Second Circuit, 253 F.2d 957 affirmed the action of the district court dismissing the suit stating, "For the reasons well stated (by the district court) we should not attempt to retrace our footsteps now, but may well await resolution of the conflict by the Supreme Court."

In reversing the Circuit Court of Appeals the Supreme Court wrote:

"We have been shown nothing in the language or history of the Federal Employers' Liability Act to indicate that this principle of law, older than the country itself, was not to apply in suits arising under that statute. Nor has counsel made any convincing arguments which might lead us to make an exception to the doctrine of estoppel in this case. To be sure language in some decisions of this Court can be taken as supporting such an exception. But that language is in dicta and is neither binding nor persuasive. Accordingly, we hold that it was error to dismiss this case. Despite the delay in filing his suit petitioner is entitled to have his cause tried on the merits if he can prove that respondent's responsible agents, agents with some authority in the particular matter, conducted themselves in such a way that petitioner was justifiably misled into a good-faith belief that he could begin his action at any time within seven years after it had accrued."

In addition to the continued assurances by the defendant's physicians that his foot or ankle would be all right and he would be fit for full duty, the plaintiff's evidence tends to show that on 9 October 1954 he was told by the defendant's Assistant General Manager, Mr. Sease, and by Mr. Ozburn, defendant's Assistant Chief Claim Agent, that the defendant would pay him every dime the defendant owed him, and these two officials of the defendant stated that each had been told by Dr. Holton that plaintiff's foot would be all right and he could return to full duty.

It was not until March 1957 that the plaintiff was informed by Mr. Ozburn that the defendant was relying on the releases signed by the plaintiff and further that the statute of limitations had run on plaintiff's claim and there was nothing he could do in connection with it.

In May 1958, the plaintiff consulted an attorney and then learned that the releases he had signed were of questionable binding effect, and that the time limitation for bringing suit may have been tolled.

In Louisville & Nashville R. R. Co. v. Disspain, 275 F.2d 25 (C.C.A. 6), it was held that where the accident occurred on 19 July 1951, and the plaintiff was told his injury was not serious, but it later developed that plaintiff did have a serious spine injury which required an operation in 1957, more than six years later, it was held that the trial court properly submitted to the jury the issue of whether the time limitation for bringing suit under F.E.L.A., had been tolled by the misrepresentation of the defendant's physician, where the plaintiff did not learn of his true condition until 10 November 1954.

While not definitely stated, the effect of this opinion was that the plaintiff had three

**16**

years after the discovery of the misrepresentation in which to bring suit since the suit was brought three years and one day after the discovery of the misrepresentation.

The court observed, " * * * it would seem perfectly clear that the railroad ought not be permitted to take advantage of an erroneous statement made by its doctor to prevent its employee from having his day in court."

We are bound by the doctrine of this case. Dickey v. West Boylston Mfg. Co., 251 Ala. 19, 36 So.2d 106, supra.

Insofar as concerns the existence of legal fraud, "It is as much a fraud to affirm as true that which is untrue, though not known to be so, as to assert what is untrue and known to be so." Southern Loan & Trust Co. v. Gissendaner, 4 Ala.App. 523, 58 So. 737.

Under the plaintiff's evidence not only was he repeatedly informed by the defendant's doctors and claim agents that his foot would be all right and he could return to full duty, that the railroad would pay him every cent it owed him, but further that the statute of limitations, and the releases barred recovery by him, and there was nothing he could do. This latter statement was made in March 1957. This latter statement was incorrect. Its overreaching tendency and possibilities of lulling the defendant into inaction are apparent.

Counsel for appellant argue that plaintiff was fitted with a brace for his leg in October 1955, and that knowledge of his true condition must be attributable to him as of that date, and the statute of limitations would run from such time. However, at the time the plaintiff was fitted with braces, according to his testimony, he was again assured by defendant's doctors that his ankle would be all right, and he would be fit for full duty.

The trial court submitted to the jury the question of the time that the plaintiff learned his cause of action was yet preserved, in light of the alleged conduct of the defendant's agents. According to plaintiff's testimony, this was upon consultation with his attorney in May 1958. Suit was brought within a year of that time. This testimony at least created a question of fact within the province of the jury to resolve. Certainly under the scintilla rule there was evidence to support the verdict and judgment in this regard.

We note that the trial court further charged the jury that another issue in the case was whether "the plaintiff did know about his rights and brought his suit within a year from knowing or discovering of those facts." This in view of the provisions of Title 7, Section 42, Code of Alabama 1940, to the effect that in an action seeking relief on grounds of fraud the cause of action must not be considered as having accrued until after the discovery of the fraud by the aggrieved party, after which he must have one year in which to bring suit.

In view of doctrines announced in Dickey v. West Boylston Mfg. Co., 251 Ala. 19, 36 So.2d 106, and the Disspain and Glus cases, supra, it is our conclusion that the time limitation could be determined only under the federal statute, and the decisions construing the same, and that Section 42, supra, could have no application.

The instructions as to Section 42, supra, were, however, in the defendant's favor, and none of its substantial rights were probably injured thereby. Sup.Ct.Rule 45. Further, if the jury under the evidence determined that the plaintiff first learned of his rights upon consultation with his attorney in March 1957, the suit was brought within a year from this date, that is on April 1958.

3. *Failure of plaintiff to restore consideration paid for releases prior to his attempted recission thereof.*

The plaintiff testified that when he was informed by Mr. Ozburn, defendant's claim agent, that the defendant was relying

on the releases executed by the defendant, and upon the statute of limitations, he inquired what could he do, and was informed by Mr. Ozburn that there was nothing he could do.

The court fully instructed the jury as to the legal principles governing recission of contracts, the necessity of restitution of benefits prior to recission, and the possibility of waiver of the requirement of restitution by conduct of the opposite party.

Under the evidence adduced we think the doctrines enunciated under the two appeals in Tuscaloosa Motor Co. v. Cockrell, 272 Ala. 1, 132 So.2d 742, and Tuscaloosa Motor Co. v. Cockrell, 272 Ala. 387, 132 So.2d 745, are decisive of the instant question.

In the first appeal this court observed:

"Whether the acts of a party are such as would be a sufficient recission is a question of fact for the jury, with appropriate instructions from the court. 77 C.J.S. Sales § 111, p. 822; Gorman-Gammill Seed & Dairy Supply Co. v. Carlisle, 220 Ala. 116, 124 So. 288.

"The rule in this jurisdiction is that in civil cases the affirmative charge should not be given when there is some or any evidence tending to support the controverted issue. 18A Ala.Dig., Trial, 139 (1 f), p. 369. We recently referred to the rule in Alabama Great Southern Railroad Co. v. Bishop, 265 Ala. 118, 123, 89 So.2d 738, 743 [64 A. L.R.2d 1190], where we said:

"'* * * in civil cases the question must go to the jury if the evidence or the reasonable inferences arising therefrom furnish "a mere 'gleam,' 'glimmer,' 'spark,' 'the least particle,' the 'smallest trace'—'a scintilla'" in support of the theory (Ex parte Grimmett, 228 Ala. 1, 152 So. 263).'"

Again in the second appeal, 272 Ala. 387, 132 So.2d 745 at 749, the court states:

"* * * Plaintiff testified that he told defendant's agent, Mr. Woodley,

that he, plaintiff, 'didn't agree to that,' that is, the contract as written and signed; and defendant's agent then told plaintiff that defendant 'couldn't do anything about it,' (the contract), 'it was out of their (defendant's) hands; that they had sold the contract.' If defendant could not do anything about the contract, as defendant's agent asserted, it would have been useless for plaintiff to say or do anything more. The law does not require the doing of a useless thing."

It is our conclusion that this judgment is due to be affirmed and it is so ordered.

Affirmed.

LIVINGSTON, C. J., and SIMPSON and MERRILL, JJ., concur.